

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

JUL 17 2017

JAMES W. McCORMACK CLERK
By:_____
                    DEP CLERK

## IN UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## WESTERN DIVISION

**PIPER PARTRIDGE, Individually as mother and next of kin to KEAGAN SCHWEIKLE and**
**As Special Administratrix of the ESTATE OF KEAGAN SCHWEIKLE; DOMINIC SCHWEIKLE, Individually as father and next of kin to KEAGAN SCHWEIKLE**

*Plaintiffs,*

**V.**

**CITY OF BENTON, ARKANSAS; KYLE ELLISON, Individually and as Employee of City of Benton, Arkansas KIRK LANE Individually and as Employee of City of Benton, Arkansas and JOHN DOES 1-20 Individually and as Employees of City of Benton, Arkansas**

*Defendants*

CASE NO.: 4:17cv460-Swws

This case assigned to District Judge Wright
and to Magistrate Judge Ray

## <u>COMPLAINT</u>

COMES NOW, Plaintiffs Dominic Schweikle ("Dominic"), and Piper Partridge ("Piper"), (collectively, "Plaintiffs"), as individuals and on behalf of the Estate of Decedent, Keagan Schweikle ("Keagan" or "Decedent"), allege as follows:

## THE PARTIES

1. Plaintiff Piper Partridge is a citizen of the United States and a resident of Saline County, State of Arkansas. Piper Partridge is the mother and heir to Decedent Keagan Schweikle. She is the Special Administratrix of the Estate of Keagan Schweikle. Piper Partridge brings this action as the personal representative of the Estate of Keagan Schweikle and individually as a citizen for her personal damages.

2. Plaintiff Dominic Schweikle is a citizen of the United States and a resident of Collier County, State of Florida. Dominic Schweikle is the father and heir to Decedent Keagan Schweikle. He brings this action individually as a citizen for his personal damages.

3. Defendant City of Benton is a political subdivision of the State of Arkansas. Furthermore, the Benton Police Department ("BPD") is a department of the City of Benton.

4. At all relevant times, Defendant Kyle Ellison ("Ellison") was a police officer with the BPD. At all times alleged in this Complaint, Defendant Ellison was acting within the course and scope of his employment and acting under the color of law. Defendant Ellison also is personally and individually liable for Plaintiffs' damages as alleged herein.

5. At all relevant times, Defendant Kirk Lane ("Lane") was the Chief of the BPD. At all times alleged in this Complaint, Defendant Lane was acting

within the course and scope of his employment and acting under the color of law. Defendant Lane also is personally and individually liable for Plaintiffs' damages as alleged herein.

6.    Plaintiffs are unaware of the true names and capacities of the Defendants named herein as DOES 1 through 20, inclusive, and therefore sue said Defendants by such fictitious names. Plaintiffs will seek leave of court to amend this complaint to allege true names and capacities of said Defendants when the same are ascertained.    Plaintiffs are informed and believe and thereon allege that each of the aforesaid factiously named Defendants are responsible in some manner for the happenings and occurrences hereinafter alleged, and the Plaintiffs' damages and injuries as herein alleged were caused by the conduct of said Defendants. Defendants DOES 1-20 are also personally and individually liable for Plaintiffs' damages as alleged herein.

## JURISDICTION AND VENUE

7.    This action arises under the Fourth, Fifth, and Fourteenth Amendments of the Constitution of the United States and 42 U.S.C. § 1983. Accordingly, the Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343. The Court has supplemental jurisdiction of Plaintiffs' state law claims under 28 U.S.C. § 1367.

8.    The claims made in this Complaint occurred and arose in Saline County, State of Arkansas.  Accordingly, venue is proper under 28 U.S.C. § 1391.

## FACTUAL BACKGROUND/GENERAL ALLEGATIONS

9.    Keagan Schweikle moved to Benton, Arkansas with his mother during his sophomore year of high school. In October 2016, Keagan, then a 17-year old junior at Harmony Grove High School, played high school baseball and was on a local paintball team. Keagan was respected by his peers and loved by his family, including his parents, Dominic Schweikle and Piper Partridge, and his 2 siblings, Nicolas Schweikle and Jack Schweikle.   Keagan was a respectful, kind hearted kid.

10.    Nevertheless, despite being an active member of the student body and being well liked by his peers, Keagan, like too many young adolescents, struggled with depression.

11.    On Monday October 17, 2016, at approximately 9:20 AM Keagan's mother, Piper, was called by the staff of Harmony Grove High School and told she needed to pick up Keagan from school since he had been suspended for having prescription cough medicine. Piper arrived at the school around 10:00 AM and met with Keagan, a coach and the principal to discuss the reasons for his suspension. While in the office, Piper called two drug treatment facilities inquiring of their availability to take Keagan immediately for intervention and treatment for his drug use and deteriorating emotional condition. Neither could take him that day. Piper and Keagan left the school at approximately 10:30 A.M.

12.    In the car Keagan became emotionally distraught, crying and making statements indicating he was becoming suicidal. His mother told him she would get him to Arkansas Children's Hospital immediately for help. She needed to go by their house at 1206 River Oaks Drive in Benton first in order to get her insurance card and purse.

13.    At the house, Piper exited the vehicle and went to her room to retrieve her billfold. Unbeknownst to her, Keagan retrieved a 9mm handgun that had been left at the house several days before by her boyfriend. Keagan told his mom "I'm going for a walk" and exited the house out the back door. Piper came downstairs and saw Keagan walking down the street towards a wooded area a block away. The wooded area is on a steep slope on the east side of the Saline River within the city limits of Benton, Arkansas. Piper got in her vehicle and drove to where the trail starts into the woods, intending to get Keagan in the car and drive to Arkansas Children's Hospital in Little Rock.

14.    Piper exited her car, walked to the top of a long set of wooden stairs at the top of the trail, and saw Keagan, having already descended the thirty stair steps, sitting on a bench. He was sobbing and saying "I have messed everything up for everybody so much" with his hands in his pockets. He then rose and pulled the 9 mm out of his coat pocket. This was the first Piper knew of a gun in his possession. Keagan raised the gun with his right hand and put it to his head.

15. Piper plead with her son to remain calm and to give her the gun. Keegan moved the gun from his head down to his side. Piper continued to plead for him to come back to the car and told him if he did not, she would have to call for help. Keegan did not come up the steps and Piper called 911 for help.

16. Piper remained relatively calm, told the dispatcher she needed assistance in getting her son, who appeared suicidal, had ingested cough syrup and maybe 'pot,' and had threatened to use a gun to shoot himself. She said he was not going to hurt anybody but himself and was very depressed after getting suspended from high school. She described the clothes he was wearing as "kaki jacket, black jeans and a hat the color 'periwinkle.' Piper said Keagan was very upset with himself and she needed "somebody to help me get him back."

17. The first officer on the scene spoke to Piper, who said that her son was suicidal, had walked into the woods, that he had a gun and she believed he was going to try and hurt himself.  Other officers arrived and one of them asked for "a dog" to help in the effort. Officer Kyle Ellison, the Benton Police officer who manned a dog named "Duco" was dispatched to assist. When Ellison arrived, Piper asked "Why is there a dog here?" Ellison never inquired or obtained any information about anything related to Keagan's state of mind, history, statements or previous actions from his mother.

18.   Up to this point, any officer who had entered the woods looking for Keagan had moved slowly through the steep terrain of the patch of woods between the houses and the river. Once the dog was involved and picked up Keagan's scent, the effort to locate Keagan turned into a 'chase.' Keagan had walked into woods within the city limits of Benton and was running from no one.

19.   Officer Ellison described the events in his first recorded interview with the BPD investigating officers, in the presence of his lawyer, ten (10) days after the shooting. Ellison was the first officer to see Keagan who was standing, 45 feet away, on the riverbank facing the river. Ellison stopped and commanded Keagan to show his hands. Holding the dog on a leash close to his left leg, he saw Keagan turn slightly to his right with a gun in his right hand at his side. Ellison drew his gun and said, "Drop the gun." Keagan said nothing then raised the gun to his right temple. Ellison again commanded Keagan to "Drop the gun" several times. Keagan simply began to move the gun away from his head when Ellison fired three quick shots at Keagan's chest, two of which hit the intended target. Ellison only stopped firing after three shots because Keagan dropped the gun and fell down. He fell toward the river on the bank and was dead in less than a minute.

20.   Keagan never pointed the gun at the officers, never discharged the gun, never spoke, and never attempted to flee. He was shot as he began to move the gun away from his head, per Ellison's orders to "drop the gun." In order to

drop a gun pointed at one's head, the gun must be moved away from one's head. Just as Keagan had done 40 minutes earlier, when his mother had begged him to put the gun down. Despite doing exactly as he was commanded by Ellison, he was shot dead.

21.     Despite posing no threat to Defendant Officers, Defendant Ellison unjustifiably shot and killed Keagan. Neither Defendant Ellison nor any other Defendant Officer attempted the use of non-lethal force before tragically taking Keagan's life.

22.     Not only did the Benton Police Department needlessly and senselessly take the life of Plaintiffs' son, later that day and those following it disparaged his name and reputation in the media and in written reports in the ensuing investigation in an attempt to avoid responsibility for their actions.

23.     At a press conference led by Captain Kevin Russell on the day of the shooting, Russell repeatedly referred to Keagan as a "suspect," falsely implicating that Keagan had been involved in criminal wrongdoing.  Additionally, Captain Russell referred to the situation that led to the Defendant Officer's presence at the scene as a "domestic disturbance," when in fact, there had been no argument nor any violent altercation that would warrant such a descriptor. He stated falsely that Keagan "did not comply with orders" and "pointed a gun at officers." Nevertheless, the use of pejorative terminology was designed to, and had the effect of, implicating wrongdoing on the part of the

Keagan in an attempt to justify the wrongful killing of a scared and de-
pressed, 17-year old boy. From the moment Ellison unjustifiably shot Kea-
gan, the BPD began a coordinated effort to create justification, after the fact,
for the shooting under the guise of a "police investigation."

24.   The BPD failed to timely obtain and report the identity of an eyewitness to
      the shooting.

25.   The BPD delayed obtaining written reports of officers involved in the search
      for Keagan. Some written reports contain completely false information of
      things allegedly said by Keagan's mother and family to officers before and
      after Keagan was shot such as:

      a.   Several reports state that Piper told the officers Keagan had on a
      "black hat" when the 911 tape clearly documents her description as "peri-
      winkle;'

      b.   Quoting Piper Partridge as telling an officer she and her son had been
      in a 'fight' and that Keagan had 'jumped from her car' to run into the woods;

      c.   Nine (9) days after the shooting Defendant Kirk Lane authored five
      written reports of his involvement on the day of the shooting and days after-
      wards. He falsely described the family as being 'uncooperative' and 'making
      alterations that were occurring to this scene' (Keagan's home) when Lane
      went to the home shortly after the family had been informed that Keagan did
      not committed suicide but had been shot by an officer. Lane went on to de-

9

scribe the family members in the immediate hours after the shooting (at the family residence) actions as 'their reluctance to allow consent' of a search of the home he described as a 'scene.'

26.     The BPD waited ten (10) days to take recorded statements from the four officers, including the shooter, who witnessed the shooting.

27.     The BPD spent most of its time and energy in the 'investigation' developing as much evidence as possible of Keagan's and his family's unrelated personal problems and history in the days, weeks, and even years before he was shot including but not limited to the following:

a.      Two days after Keagan's death, sending a request to Collier County Florida Sherriff Department for incident reports involving Keagan's father, mother and Keagan in 2011 and 2014;

b.      Spending extensive time interviewing Keagan's former girlfriend and friends about what drugs they had experimented with and his mental state weeks before his death;

c.      Conducting extensive interviews of teachers involved with the cough syrup incident that resulted in Keagan's suspension from school and seeking names and descriptions of other students who may have been involved with similar activity;

d.      Conducting multiple interviews with Piper Partridge's then boyfriend about Keagan's actions and use of illegal substances weeks and months before his death;

e.      Obtaining court records of minor traffic and misdemeanor tickets Keagan had been issued earlier in 2016;

f.      Four days after the shooting unsuccessfully trying twice to have a Saline County Circuit Judge give the BPD access to sealed Juvenile Court records.

28.    The BPD failed to adequately document or properly investigate Keagan's shooting in the following manner;

a.      Within 22 hours of Keagan's death, conducted their first official interview in the investigation by taking a video recorded statement of Piper Partridge for one hour and thirty one minutes at the BPD getting details of Keagan's history and events of the day of the shooting;

b.      Interviewed Officer Ellison for nine (9) minutes ten (10) days after the shooting;

c.      Did nothing to document any other 'use of force' reports of Officer Ellison or inquire into his mental state and history at the time he killed Keagan;

d.      Did nothing to document the BPD 'use of deadly force' policies and procedures nor addressed if Ellison complied with the same;

e.    Did not refer the investigation to an outside agency such as the State

Police but instead assigned the lead investigator role to an officer who par-

ticipated in the search for Keagan, was in charge of collecting all 'crime

scene' evidence where the shooting occurred and works on a daily basis with

Officer Ellison.

### FIRST CAUSE OF ACTION
### SURVIVAL – VIOLATION OF CIVIL RIGHTS 42 U.S.C. §1983
(Plaintiffs against Defendants  Ellison, Lane and Does 1 through 20)

29.    Plaintiffs reallege and incorporate by reference each and every allegation

contained in the preceding paragraphs as if fully set forth herein.

30.    Defendants were, at all relevant times, law enforcement officers with the

City of Benton Police Department who were acting under color of state law.

31.    Plaintiffs bring this claim for relief in their capacities as the successors-in-

interest and personal representatives of the Decedent, Keagan Schweikle as

well as individually and personally.

32.    The foregoing claim for relief arose in Decedent's favor, and Decedent

would have been the plaintiff with respect to this claim for relief had he

lived.

33.    Defendants, acting under color of state law, deprived the Decedent of rights,

privileges, and immunities secured by the Constitution and laws of the

United States, including those enumerated in and secured by the Fourth

Amendment to the Constitution, by subjecting the decedent to excessive force when they unnecessarily shot and killed him, with deliberate indifference, despite Decedent posing no threat to anyone but himself.

34. Defendant Officers failed to even try to subdue Decedent in a proper and non-life-threatening manner. Defendant Ellison used excessive and deadly force by deploying his weapon before even attempting to solicit the help of Decedent's mother and/or a crisis counselor in de-escalating the situation, and before ever attempting the use of non-lethal force. The wrongful acts alleged herein above of Defendant Officers were the cause of Decedent's death.

35. As a proximate result of the foregoing wrongful acts of Defendants, and each of them, the Decedent sustained general damages, including pain and suffering, and a loss of the enjoyment of life and other hedonic damages, in an amount in accordance with proof.

36. In doing the foregoing wrongful acts, Defendants, and each of them, acted in reckless and callous disregard for the constitutional rights of Decedent. The wrongful acts, and each of them, were willful, oppressive, fraudulent and malicious, thus warranting the award of punitive damages against each individual Defendant in an amount adequate to punish the wrongdoers and deter future misconduct. As further damage, Plaintiffs have and will incur attor-

neys' fees and pursuant to 42 U.S.C. § 1988 are entitled to recover costs and

fees in pursuing rights for a violation of 42 U.S.C. § 1983.

## SECOND CAUSE OF ACTION
## SURVIVAL – VIOLATION OF CIVIL RIGHTS
## 42 U.S.C. §1983 – *MONELL* CLAIM

(Plaintiffs against Defendants Ellison, Lane, the City of Benton and Does 1
through 20)

37.    Plaintiffs reallege and incorporate by reference the allegations contained in

the preceding paragraphs of this complaint, as though fully set forth herein.

38.    Plaintiffs bring this claim for relief in their capacities as the successors-in-

interest and personal representatives of the Decedent, Keagan Schweikle and

in their individual capacity.

39.    Defendants, City of Benton and Does 1 through 20, knowingly, with gross

negligence, and in deliberate indifference to the Constitutional rights of citi-

zens, maintain and permit an official policy and custom of permitting the oc-

currence of the types of wrongs set forth herein above and hereafter.

40.    These policies and customs include, but are not limited to, the deliberately

indifferent training of its law enforcement officers in the use of excessive

force, deadly force, and medical aid, the express and/or tacit encouragement

of excessive force, the ratification of police misconduct, and the failure to

conduct adequate unbiased investigations of police misconduct such that fu-

ture violations do not occur.    Moreover, knew their failure to adequately

train law enforcement officers made it highly predictable that law enforce-

ment officers would engage in conduct that would deprive persons such as decedent Keagan Schweikle and Plaintiffs of their rights.

41. Plaintiffs are informed and believe, and thereon allege, that the customs and policies were the moving force behind the violations of Plaintiffs' and Decedents rights. Based upon the principles set forth in *Monell v. New York City Dept. of Social Services*, the City of Benton, Ellison, Lane and Does 1 through 20 are liable for all of the injuries sustained by Decedent and Plaintiffs as set forth above.

42. As a proximate result of the foregoing wrongful acts of Defendants, and each of them, the Decedent sustained general damages, including pain and suffering, and a loss of the enjoyment of life and other hedonic damages, in an amount in accordance with proof.

43. Due to the conduct of Defendants, and each of them, Plaintiffs have been required to incur attorney's fees and will continue to incur attorneys' fees, and pursuant to 42 U.S.C. § 1988 are entitled to recovery of said fees.

### THIRD CAUSE OF ACTION
### VIOLATION OF CIVIL RIGHTS 42 U.S.C. § 1983 – DEPRIVATION OF THE RIGHTS OF PLAINTIFFS TO A FAMILIAL RELATIONSHIP WITH THE DECEDENT
(Plaintiffs against Defendants City of Benton, Ellison, Lane and Does 1 through 20)

44. Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint, as though fully set forth herein.

45.    Defendants, acting under color of state law, deprived the Decedent of rights, privileges, and immunities secured by the Constitution and laws of the United States, including those enumerated in and secured by the Fourth Amendment to the Constitution, by subjecting the Decedent to excessive force when they unnecessarily shot and killed him. Despite Decedent posing no threat to anyone but himself, Defendant Officers failed to even try to subdue Decedent in a proper and non-life-threatening manner.   Defendant Ellison used excessive and deadly force by deploying his weapon before even attempting to solicit the help of Decedent's mother and/or a crisis counselor in de-escalating the situation, and before ever attempting the use of non-lethal force.

46.    As a result of the foregoing wrongful acts of Defendants, and each of them, Plaintiffs sustained general damages, including grief, emotional distress and pain and suffering and loss of comfort and society, and special damages, including loss of support, in an amount in accordance with proof.

47.    In doing the foregoing wrongful acts, Defendants, and each of them, acted in reckless and callous disregard for the Constitutional rights of Plaintiffs when they killed Plaintiff's' son. The wrongful acts, and each of them, were willful, oppressive, fraudulent, and malicious, thus warranting the award of punitive damages against each individual defendant in an amount adequate to punish the wrongdoers and deter future misconduct.

48.     As further damage, Plaintiffs have and will incur attorneys' fees and pur-

        suant to 42 U.S.C. § 1988 are entitled to recover costs and fees in pursuing

        rights for a violation of 42 U.S.C. § 1983.

**FOURTH CAUSE OF ACTION**
**VIOLATION OF CIVIL RIGHTS 42 U.S.C. § 1983 – DEPRIVATION OF**
**THE RIGHTS OF PLAINTIFFS TO A FAMILIAL RELATIONSHIP WITH**
**THE DECEDENT –** ***MONELL***

(Plaintiffs against Defendants Ellison, Lane, the City of Benton and DOES 1
through 20)

49.     Plaintiffs reallege and incorporate by reference the allegations contained in

        the preceding paragraphs of this Complaint, as though fully set forth herein.

50.     Defendants, City of Benton, Ellison, Lane and Does 1 through 20, knowing-

        ly and with gross negligence, maintain and permit official policies and cus-

        toms which allow the occurrence of the types of wrongs set forth herein

        above and below, all in deliberate indifference to the Constitutional rights of

        citizens.

51.     These policies and customs include, but are not limited to, the deliberately

        indifferent training of its law enforcement officers in the use of excessive

        force, deadly force, and medical aid, the express and/or tacit encouragement

        of excessive force, the ratification of police misconduct, and the failure to

        conduct adequate unbiased investigations of police misconduct such that fu-

        ture violations do not occur.  Moreover, Defendants, Ellison, Lane, City of

        Benton and Does 1 through 20, knew their failure to adequately train law en-

17

forcement officers made it highly predictable that law enforcement officers would engage in conduct that would deprive persons such as decedent Keagan Schweikle and Plaintiffs of their rights.

52. Plaintiffs are informed and believe, and thereon allege, that the customs and policies were the moving force behind the violations of Plaintiffs' and decedent's rights. Based upon the principles set forth in *Monell v. New York City Dept. of Social Services*, the City of Benton is liable for all of the injuries sustained by Plaintiffs as set forth above.

53. In acting as alleged herein, Defendants, and each of them, caused Keagan's demise and the resulting loss to Plaintiffs, thereby causing Plaintiffs to be damaged in an amount to be determined at the time of trial.

54. Due to the conduct of Defendants, and each of them, Plaintiffs have been required to incur attorneys' fees and will continue to incur attorneys' fees, and pursuant to 42 U.S.C. § 1988 are entitled to recovery of said fees.

### FIFTH CAUSE OF ACTION
### ASSAULT AND BATTERY
(Plaintiffs against Defendants Ellison, Lane, City of Benton and Does 1 through 25)

55. Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs of this Complaint, as though fully set forth herein.

56. Defendant Ellison, Lane, city of Benton and Does 1 through 20 had a duty to act reasonably when using deadly force, i.e., not to use deadly force in an

improper matter. Defendant Ellison knowingly, willfully, maliciously and with extreme indifference to the value of human life, shot Keagan Schweikle thereby committed an assault and battery.

57.   Defendants breached said duty due to the acts described above, including, but not limited to, (1) shooting Decedent, and/or (2) provoking the danger-ous situation which Defendants allege justified the use of deadly force against Decedent by, among other acts and omissions, failing to construct a plan for when Defendant Officers located Decedent's whereabouts, failing to enlist the help of a crisis counselor and/or Decedent's mother, Piper and un-necessarily enlisting a K9 in the search.

58.   Defendants, and each of theirs, conduct was a substantial factor in causing Plaintiffs' harm.

59.   Plaintiffs are informed and believe and thereon allege that the acts of the De-fendants were willful, malicious, intentional, oppressive, reckless, and/or were done in willful and conscious disregard of Decedent's rights, welfare, and safety. Accordingly, Plaintiffs request punitive and exemplary damages in an amount to be determined at the time of trial.

60.   As a direct and legal result of Defendants' acts and omissions, Plaintiffs have suffered damages, including, but not limited to, pain and suffering, extreme mental and emotional distress, fear, trauma, attorney's fees, costs of suit, past and future loss of earnings, and other pecuniary losses not yet ascertained.

## SIXTH CAUSE OF ACTION
## DAMAGES FOR WRONGFUL DEATH

61.   Plaintiff restates and reasserts each of the allegations contained in paragraphs 1-60.

62.   That as a direct and proximate result of the collective acts and omissions as stated above Keagan Schweikle died on October 17, 2016. Keagan Schweikle's death was the result of wrongful and unconstitutional acts and omissions by the Defendants, as alleged herein and were the proximate cause of his death.

63.   That as a direct and proximate result of the wrongful death of Keagan Schweikle, Piper Partridge, as special administratrix, claims damages and prays for an amount in excess of the minimum federal jurisdictional limits which at this time are Seventy Five Thousand Dollars, $75,000.00, exclusive of interest and cost.  Such injuries and damages include but are not limited to:

a.   for the loss of life of Keagan Schweikle;

b.   for the funeral expenses of Keagan Schweikle;

c.   for the conscious pain, suffering and mental anguish of Keagan Schweikle prior to his death;

d.   for medical expenses attributed to the fatal injury of Keagan Schweikle;

e.      for the mental anguish and grief of Piper Partridge, mother of Keagan Schweikle;

f.      for the mental anguish and grief of Dominic Schweikle, father of Keagan Schweikle;

g.      for the mental anguish and grief of Nicholas Schweikle and Jack Schweikle brothers of Keagan Schweikle;

## PUNITIVE DAMAGES

64.    That the acts of the defendants were intentional or in reckless disregard of the rights of Keagan Schweikle from which malice may be inferred and plaintiff seeks punitive damages in excess of $75,000.00 from defendants to punish them for their acts and to deter other deputies and officials from similar conduct.

65.    Plaintiffs demand a TRIAL by JURY.

**WHEREFORE**, Plaintiffs prays for judgment as follows: For general damages in an amount to be determined by proof at trial; For special damages in an amount to be determined by proof at trial; For punitive and exemplary damages against the individual Defendants for the First, Third and Fifth Causes of Action; For costs of suit; For reasonable attorneys' fees and costs as provided by statute; and For such other and further relief as the Court deems just and proper.

Respectfully Submitted,

21

By: _____

Richard E. Holiman (No. 79091)
**Holiman Law Firm P.A.**
212 Center St. Suite 325
Little Rock, Arkansas 72201
Ph. 501-375-1170
Fax 501-325-1655
rick@holimanlaw.com

Mark Geragos (SBN 108325)
**Geragos & Geragos, APC.**
HISTORIC ENGINE CO. NO. 28
644 South Figueroa Street
Los Angeles, California  90017-3411
Telephone  (213) 625-3900
Facsimile  (213) 232-3255
Geragos@Geragos.com


David Gammill (*Pro Hoc Pending*)
**Geragas & Geragos, APC.**
HISTORIC ENGINE CO. NO. 28
644 South Figueroa Street
Los Angeles, California  90017-3411
Telephone  (213) 625-3900
Facsimile  (213) 232-3255
David@Geragos.com