**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**
**WESTERN DIVISION**

**PIPER PARTRIDGE, individually as mother and next of kin to KEAGAN SCHWEIKLE and as Special Administratrix of the ESTATE OF KEAGAN SCHWEIKLE; DOMINIC SCHWEIKLE, Individually as father and next of kin to KEAGAN SCHWEIKLE** **PLAINTIFF**

**NO: 4:17-cv-00460-BSM**

**CITY OF BENTON, ARKANSAS; KYLE ELLISON, Individually and as Employee of City of Benton, Arkansas; KIRK LANE, Individually and as Employee of City of Benton, Arkansas; and JOHN DOES 1-20, Individually and as Employees of City of Benton, Arkansas** **DEFENDANT**

# PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

COMES NOW, Plaintiffs, Dominic Schweikle ("Dominic"), and Piper Partridge ("Piper"), (collectively, "Plaintiffs"), as individuals and on behalf of the Estate of Decedent, Keagan Schweikle ("Keagan" or "Decedent") by and through undersigned counsel, and for their Brief in Opposition to Defendants' Motion for Judgment on the Pleadings, herein state:

## INTRODUCTION

In the late morning of October 17, 2016, Piper Partridge became concerned that her son, Keagan, was suicidal. Piper made the tragic mistake of calling the police for help—believing that they would protect her son from

self-harm. Yet, approximately 40 minutes later, and just moments after locating Keagan, one of those very officers whom Piper had placed her trust in, unjustifiably fired three shots at Keagan, killing him on the spot.

Plaintiffs have brought four separate causes of action under 42 U.S.C. §1983 for excessive force and for the deprivation of Plaintiffs'14th Amendment Right to a familial relationship with their son. The First and Third Causes of Action are brought against Defendant Officer Kyle Ellison and Defendant Chief of Police Kirk Lane (as well as Does 1 through 20) in their individual capacity, while the Second and Fourth Causes of Action are brought against the City of Benton and Defendants Ellison and Lane (and Does 1 through 20) in their official capacity.

Plaintiffs allege in their Complaint that Defendant Officers were on notice, prior to the shooting, that Keagan was suicidal and had walked into the woods by himself with a gun after threating to shoot himself. *See* Complaint (hereinafter "Compl."), ¶¶ 16-17. Moreover, Piper had informed the 911 dispatcher that Keagan was not going to hurt anybody but himself. Compl. ¶ 16. The Complaint further alleges that when Defendant Officers located Keagan in the woods, (1) Keagan was approximately 45 feet away from the officers; (2) Keagan never pointed the gun at the officers (2) Keagan never discharged the gun, never spoke, and never attempted to flee; (3) Keagan was shot as he was complying with Defendant Officers' orders to lower the gun away from his head; and (4) neither Defendant Ellison nor any other Defendant Officer attempted the use of non-lethal force before resorting to lethal force that tragically and unnecessarily took Keagan's life. Compl., ¶¶ 19–21.

Accordingly, Plaintiffs have pled sufficient facts to support their claim that Defendant Ellison's use of deadly force was excessive and deprived Plaintiffs' of their constitutionally protected liberty interest in the compan-

ionship and society of their son. Moreover, Plaintiffs have pled sufficient facts to support its allegations that Defendants maintained and permitted official policies and customs that allowed for and contributed to the occurrence of this tragic incident. *See* Compl., ¶¶ 22-28.

Because Plaintiffs have adequately pled the requirements set forth under 42 U.S.C. §1983 and in *Monell v. Department of Social Services*, 436 U.S. 658 (1978), Defendants' Motion for Judgment on the Pleadings should be denied. Defendants also set forth a request that the Court not extend supplemental jurisdiction over Plaintiffs' state law claims. Because Defendants cite no case law or facts in support of its request, Defendants' Motion should be denied on this ground as well. Lastly, while Plaintiff agrees with Defendants' analysis regarding the applicability of the 5th Amendment to the present matter, this in no way affects the viability of any of Plaintiffs' § 1983 Causes of Action given the applicability of the 14th Amendment to state actors.

## FACTUAL BACKGROUND

On October 17, 2016, Plaintiff Piper Partridge feared that her teenage son, Keagan Schweikle ("Keagan" or "Decedent") was suicidal, and called 911 seeking their help. Piper told the 911 dispatcher that she needed assistance, that her son appeared suicidal and had gone into the woods alone with a gun (that he had retrieved from their home) after threating to shoot himself. Compl., ¶ 16. She told the 911 dispatcher that he was not going to hurt anybody but himself, and that he was very depressed after getting suspended from high school. She described the clothes he was wearing as well as told the dispatcher that Keagan was very upset with himself and that she needed "somebody to help me get him back." Id.

Piper spoke to the first officer on the scene, and reiterated what she had told the 911 dispatcher: that her son was suicidal, had walked into the woods, that he had a gun and she believed he was going to try and hurt him-

self. Compl., ¶ 17. Other officers arrived and one of them asked for "a dog" to help in the effort. Defendant Officer Kyle Ellison ("Ellison"), a Benton Police officer who manned a dog named "Duco" was dispatched to assist. Id. Once the dog was involved and picked up Keagan's scent, the effort to locate Keagan through the steep terrain of the patch of woods between the houses and the river turned into a 'chase'—despite the fact that Keagan had walked into the woods alone and was running from no one. Compl., ¶ 18.

When Ellison spotted Keagan, Keagan was standing, 45 feet away, on the riverbank facing the river. Compl., ¶ 19. Ellison commanded Keagan to show his hands. Keagan turned slightly to his right; the gun was in his right hand, at his side. Ellison drew his gun and yelled, "Drop the gun." Keagan said nothing then raised the gun to his right temple. Ellison repeated the commands to "Drop the gun," and Keagan began to move the gun away from his head, only to have Ellison fire three shots at Keagan's chest, two of which hit the intended target. Ellison only stopped firing after three shots because Keagan dropped the gun and fell down. He fell toward the river on the bank and was dead in less than a minute. Id.

Keagan never pointed the gun at the officers, never discharged the gun, never spoke, and never attempted to flee. Compl., ¶ 20. He was shot as he began to move the gun away from his head, per Ellison's orders to "drop the gun." In order to drop a gun pointed at one's head, the gun must be moved away from one's head. Despite doing exactly as he was commanded by Ellison, he was shot dead. Id. At the time of the shooting, Keagan posed no threat to Defendant Officers or to anyone else other than himself. Neither Defendant Ellison nor any other Defendant Officer attempted the use of non-lethal force before tragically taking Keagan's life. Compl., ¶ 21.

Not only did the Benton Police Department ("BPD") needlessly and senselessly take the life of Plaintiff's' son, later that day and those following,

the Benton Police Department disparaged the Deceased's name and reputation in the media and in written reports in the ensuing investigation in an attempt to avoid responsibility for their actions. Compl., ¶ 22.

To add further insult to injury, the BPD's investigation of the incident was seriously flawed, as the BPD seemed more intent on deflecting blame than on conducting a legitimate investigation. See Compl., ¶ 23. The BPD failed to timely obtain and report the identity of an eyewitness to the shooting. Compl., ¶ 24. The BPD delayed obtaining written reports of officers involved in the search for Keagan. Compl., ¶ 25. Moreover, when obtained, some of the written reports contained falsehoods regarding what was communicated by Keagan's mother and family to the Officers before and after the shooting, and seemingly tried to paint Plaintiffs in a bad light so as to deflect blame. See id. Additionally, the BPD waited ten (10) days to take recorded statements from the four officers who witnessed the shooting—including the shooter himself. Compl., ¶ 26.

The BPD further failed to adequately document or properly investigate Keagan's shooting. Compl., ¶ 28. For example, the BPD interviewed Defendant Ellison for just nine (9) minutes ten (10) days after the shooting; Did nothing to document any other 'use of force' reports relating to Defendant Ellison or to inquire into his mental state and history at the time he killed Keagan; Did nothing to document the BPD 'use of deadly force' policies and procedures nor addressed if Ellison complied with the same; Did not refer the investigation to an outside agency, such as the State Police, but instead assigned the lead investigator role to an officer who participated in the search for Keagan, was in charge of collecting all 'crime scene' evidence where the shooting occurred and works on a daily basis with Defendant Ellison. Id.

Rather than conduct a legitimate investigation, the BPD spent most of its time and energy developing as much evidence as possible on Deceased's, and the Deceased's family's, unrelated personal problems and history in the days, weeks, and even years before the shooting. Compl., ¶ 27. In sum, from the moment Defendant Ellison unjustifiably shot Keagan, the BPD began a coordinated effort to create after-the-fact justification under the guise of a "police investigation." Compl., ¶ 23.

## **LEGAL STANDARD**

Federal courts follow "a fairly restrictive standard in ruling on motions for judgment on the pleadings." *United States v. Halifax Hosp. Med. Ctr.*, 997 F. Supp. 2d 1272, 1274 (M.D. Fla. 2014) (citations omitted). Overly hasty or imprudent use of this summary procedure by the courts violates the public policy in favor of ensuring to each litigant a full and fair hearing on the merits of his claim or defense. *Roemhild v. Jones*, 239 F.2d 492, 494 (8th Cir. 1957), quoting Barron and Holtzoff, Federal Practice and Procedure, Vol. 1, section 359, pages 673-674 ('''The policy of the courts is to dispose of law suits on their merits whenever possible rather than on motions for judgments on pleadings'''); *Comcast Cable Commc'ns, LLC v. Hourani*, 190 F. Supp. 3d 29, 32 (D.D.C. 2016) ("'Because a Rule 12(c) motion would summarily extinguish litigation at the threshold and foreclose the opportunity for discovery and factual presentation, the Court must treat [such a] motion with the greatest of care and deny it if there are allegations in the complaint which, if proved, would provide a basis for recovery.'") (quotations omitted).

Courts review motions for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) using the same standards as motions to dismiss under Rule 12(b)(6). *Ramirez v. Dep't of Corr.*, 222 F.3d 1238, 1240 (10th Cir. 2000). Applying that standard, a court should not dismiss a com-

plaint "'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Nogbou v. Mayrose*, 400 F. App'x 617, 619 (2d Cir. 2010) (citations and quotations omitted).

In considering a motion for judgment on the pleadings, a court must assume that the general allegations set forth in a complaint embrace the necessary, specific facts to support each respective claim. *Peolza v. Capistrano Unified School District*, 37 F.3d 517, 521 (9th Cir. 1994). The Court must "view all facts pleaded by the nonmoving party as true and grant all reasonable inferences in favor of that party." *Poehl v. Countrywide Home Loans, Inc.*, 528 F.3d 1093, 1096 (8th Cir. 2008) (citations omitted); *Williams v. Craighead Cty. Jail*, No. 3:10CV00049-JMM-JTK, 2010 WL 4817381, at *1 (E.D. Ark. Nov. 4, 2010), *report and recommendation adopted*, No. 3:10CV00049-JMM-JTK, 2010 WL 4818537 (E.D. Ark. Nov. 22, 2010) (quotations omitted). Furthermore, all contravening assertions in the movant's pleadings are to be taken to be false. *See MacDonald v. Du Maurier*, 144 F.2d 696, 700-01 (2nd Cir. 1944). Significantly, ***"'[t]his standard is "applied with particular strictness when the plaintiff complains of a civil rights violation,"'"*** *Shechter v. Comptroller of City of New York*, 79 F.3d 265, 270 (2d Cir. 1996) (quotations omitted) (emphasis added).

Under this standard, to survive a Rule 12(b)(6) motion a complaint need only "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations omitted)). "Thus, when resolving this type of motion, the court's job is essentially to ask: If everything the plaintiffs allege is true, do those allegations establish an injury that the law redresses? If the answer is yes, the case continues . . . ." *P.J. ex rel. Jensen v. Utah*, No. 2:05CV00739 PGC, 2006 WL 1702585, at *2 (D. Utah June 16, 2006) (un-

published). As such, if the Court, after accepting all of the Plaintiffs' allegations as true, finds that Plaintiffs have adequately pled their causes of action, the Defendant's Motion for Judgment on the Pleadings should be denied.

## ARGUMENT

### I. Plaintiffs' First And Third Causes Of Action Against Defendant Officers In Their Individual Capacity Are Adequately Pled

#### A. Plaintiffs Have Pled Sufficient Facts To Establish Their Section 1983 Claims Against Defendant Officers In Their Individual Capacity

##### 1. Plaintiffs Have Pled Sufficient Facts To Establish Defendants' Use Of Deadly Force Was Excessive And Unconstitutional, In Violation Of Decedent's Rights Under The Fourth And Fourteenth Amendments

Plaintiffs' excessive force claim brought under § 1983 survives because Plaintiffs adequately allege unreasonable police conduct involving the use of excessive deadly force against a suicidal teenager that amounts to a violation of the Fourth and Fourteenth Amendments.

A claim against law enforcement officers for excessive force is analyzed under the Fourth Amendment's "objective reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 388 (1989). "The Fourth Amendment requires police officers making an arrest to use only an amount of force that is objectively reasonable in light of the circumstances" as perceived by a reasonable officer at the scene. *Blankenhorn v. City of Orange*, 485 F.3d 463, 477 (9th Cir. 2007) (citing *Tennessee v. Garner*, 471 U.S. 1, 7–8 (1985)); *Graham*, 490 U.S. at 396–97; *Thompson v. Hubbard*, 257 F.3d 896, 899 (8th Cir. 2001) ("'The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight'") (citing *Graham v. Connor*, 490 U.S.

386, 396, 397(1989)). This reasonable analysis takes into account all of the information "possessed by the officer at the moment that force is employed." *Waterman v. Batton*, 393 F.3d 471, 481 (4th Cir. 2005).

Deadly force may only be used only where the totality of the circumstances give the officer "probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). "This standard is more detailed and demanding than the one that governs excessive-force claims not including deadly force." *Rahn v. Hawkins*, 464 F.3d 813, 818 (8th Cir. 2006)(citations omitted). Whether the use of deadly force is reasonable is highly fact-specific. In determining whether an officer has used excessive force courts must consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). Other relevant factors include "the availability of less intrusive alternatives to the force employed, whether proper warnings were given *and whether it should have been apparent to officers that the person they used force against was emotionally disturbed*. *Glenn v. Washington Cty.*, 673 F.3d 864, 872 (9th Cir. 2011) (citations omitted) (emphasis added). *Glenn v. Wash. Cnty.*, 673 F.3d 864, 872 (9th Cir.2011).

In fact, several courts have highlighted the need, in certain situations, to factor in an officer's knowledge of a suspect's mentally disturbed status when assessing whether the use of force was reasonable. *See id.*; *Deorle v. Rutherford*, 272 F.3d 1272, 1282-83 (9th Cir.2001); *Palmquist v. Selvik*, 111 F.3d 1332, 1340-41 (7th Cir. 1997); *Ludwig v. Anderson*, 54 F.3d 465, 472 (8th Cir. 1995). *See also Waterman v. Batton*, 393 F.3d 471, 481 (4th Cir. 2005) (to properly consider the reasonableness of the force employed, the

court required consideration of "the full context, with an eye toward the proportionality of the force in light of all the circumstances."

In *Delore*, the Court noted that "[t]he problems posed by, and thus the tactics to be employed against, an unarmed, emotionally distraught individual who is creating a disturbance or resisting arrest are ordinarily different from those involved in law enforcement efforts to subdue an armed and dangerous criminal who has recently committed a serious offense." *Deorle v. Rutherford*, 272 F.3d 1272, 1282-833 (9th Cir. 2001). The Court explained that, "[e]ven when an emotionally disturbed individual is 'acting out' and inviting officers to use deadly force to subdue him, the governmental interest in using such force is diminished by the fact that the officers are confronted, not with a person who has committed a serious crime against others, but with a mentally ill individual." *Id.* at 1283. Similarly, in both *Palmquist v. Selvik*, 111 F.3d 1332, 1340-41 (7th Cir. 1997) and *Ludwig v. Anderson*, 54 F.3d 465, 472 (8th Cir. 1995), the courts held that an officers' awareness of an emotionally disturbed person's suicidal motivation may have a bearing on what tactics and levels of force are reasonable.

Here, the Complaint alleges that Piper told the 911 dispatcher and the arriving officer at the scene that her son was suicidal and had threatened to shoot himself, that he had walked into the woods alone with a gun, and that he was not going to hurt anybody but himself. Compl., ¶¶ 16–17. The Complaint further alleges that after Defendant Officers located Keagan in the woods, (1) Keagan was approximately 45 feet away from the officers; (2) Keagan never pointed the gun at the officers (2) Keagan never discharged the gun, never spoke, and never attempted to flee; (3) Keagan was shot as he was complying with Defendant Officers' orders to lower the gun away from his head; and (4) neither Defendant Ellison nor any other Defendant Officer attempted the use of non-lethal force before resorting to le-

thal force that tragically and unnecessarily took Keagan's life. Compl., ¶¶ 19–21.

These facts, taken as true, are sufficient to establish that at the time of the shooting, Keagan did not pose a serious threat to the officers or to anyone other than himself. Plaintiffs have therefore adequately alleged that Defendant Officers used excessive force against Keagan in violation of his Constitutional rights under the 4th and 14th Amendments.

Defendants' defense, that their conduct was reasonably because Keagan failed to obey the officers' orders is flawed for several reasons. The first of which is that this is a fact that Plaintiffs directly dispute in its Complaint. *See* Compl. ¶¶19-20. Second, in following paragraphs Defendants essentially try to argue that the act of *complying* with Defendant Ellison's orders created justification for the use of deadly force. *See* Defs.' Mot. p., 7: "it was 'virtually impossible' for Defendants to have known when Keagan was moving the gun per the Officers' commands or if he was going to aim and shoot the officers." This logic is improper for two significant reasons. First, and as noted above, Plaintiffs have pled that Keagan complied with Defendants' orders in lowering the gun from his head and that Keagan ever pointed the gun at the officers, *see* Compl. ¶ ¶ 19-20; thus to accept Defendants' argument that "it was 'virtually impossible' for Defendants to have known this" would require an impermissible inference in favor of Defendants and in contradiction of facts pled by Plaintiffs. Second, Defendants' logic, that both compliance and noncompliance with an officer's orders justifies the use of lethal force is untenable.

Moreover, while Defendants concede, at certain points in its Motion, that Plaintiffs' factual allegations must be taken as true, they then go on to make arguments regarding the reasonableness of their conduct, including by making analogies to the cases they've cited to, that are premised on facts

which Plaintiffs directly dispute in its complaint. Such facts include, but are not limited to, Defendants' assertions that: (1) Keagan never complied with officers' commands, *see* Defs.' Mot. p., 5-7, 9-10; (2) that Keagan was responsible for creating, what Defendants refer to as the "tense and dangerous" situation leading up to the shooting; *see* Defs.' Mot. p., 7, 10; and (3) that Keagan posed a significant threat of death or serious injury *to the officers*, *see* Defs.' Mot. p., 5, 9-10.

In light of the forgoing, Defendants' Motion for Judgment on the Pleadings as to Plaintiffs' § 1983 Claim for Excessive Force against Defendant Officers in their individual capacity should be denied.

**2. Plaintiffs Have Pled Sufficient Facts To Establish Defendants' Unconstitutional Deprivation Of Plaintiffs' 14th Amendment Right To A Familial Relationship With Their Son**

Parents possess a constitutionally protected liberty interest in the companionship and society of their children under the 14th Amendment. *Kelson v. City of Springfield*, 767 F.2d 651, 654-55. "The state's interference with that liberty interest without due process of law is remediable under [42 U.S.C. § 1983]". *Id.* at 655. *See Id.* at 652-53, 655 (held that parents of 14-year-old who committed suicide in school had cognizable claim against the school under § 1983 for the deprivation of their parental rights); *Mattis v. Schnarr*, 502 F.2d 588, 593–95 (8th Cir.1976), *disapproved of by Jackson v. Marsh*, 551 F. Supp. 1091 (D. Colo. 1982) (held that father whose son had been shot and killed while attempting to escape arrest had a "constitutionally protected right[] under the due process clause of the Fourteenth Amendment to the Constitution of the United States," for which he could bring a claim under § 1983).

Here, Plaintiffs have alleged that Defendants are responsible for the unlawful killing of their teenage son, thereby depriving them of their constitutionally protected interest in the companionship and society of their child without due process.. As a direct and proximate result of Defendants' conduct, Plaintiffs' have experienced, and continue to experience, debilitating grief at the loss of their child, with whom they shared a deep attachment and love. This deprivation is all the more egregious when considering the fact that Piper called 911 seeking Defendants' *help* to bring her son home safely.

In light of the foregoing, Defendants' Motion for Judgment on the Pleadings should be denied as to the Third Cause of Action under 42 U.S.C. §1983, for the deprivation of the rights of plaintiffs to a familial relation with the Decedent in violation of Plaintiffs' 14th Amendment rights.

**B. Defendant Officers Are Not Protected By Qualified Immunity**

None of the Defendants are entitled to qualified immunity, as no reasonable person could possibly believe that Defendants' actions—shooting a suicidal teenager, whom the offices were called to help, as he was complying with Defendants orders, and before ever attempting the use of nonlethal force—was lawful under the circumstances. As such, Defendants' motion should be denied as to qualified immunity.

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015) (internal quotations and citations omitted). The qualified immunity inquiry requires a two-pronged analysis: (1) whether the facts the plaintiff alleges make out a violation of a constitutional right; and (2) whether that right was clearly established at the time the defendant acted. *Castro v. Cnty. of L.A.*, 833 F.3d 1060, 1066 (9th Cir.2016).

Whether a right is clearly established turns on whether, "at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). "In order to find that the law was clearly established, however, [courts] need not find a prior case with identical, or even 'materially similar,' facts" *Flores v. Morgan Hill Unified Sch. Dist.*, 324 F.3d 1130, 1136–37 (9th Cir. 2003). Instead, the court's task is to determine "whether the preexisting law provided the defendants with 'fair warning' that their conduct was unlawful." *Id; Hope v. Pelzer*, 536 U.S. 730, 739-40 (2002) (this second inquiry ensures officers have 'fair notice' of what conduct does or does not deprive an individual of a constitutional right.). This standard does not depend on precedent within the same circuit where the case arose, as long as the law is supported by a consensus of circuits. *McClendon v. City of Columbia*, 305 F.3d 314, 329-31 (5th Cir. 2002). Furthermore, when a case presents novel facts, the "clearly established" analysis does not automatically favor the officer. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). Rather, the question presented is whether, in light of pre-existing law, the unlawfulness of the officer's act is still apparent. *Malley v. Briggs*, 475 U.S. 335, 344-345 (1986).

The Supreme Court has further acknowledged that in an "obvious case," even constitutional rights "cast at a high level of generality" can be clearly established without a body of relevant case law. *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004); *Hardwick v. Vreeken*, 844 F.3d 1112, 1120 (9th Cir. 2017) (quoting *Hope v. Pelzer*, 536 U.S. 730, 745 (2002)) (alteration in original) (in some instances "conduct is so clearly and obviously wrong that the conduct itself unmistakably 'should have provided [defendants] with some notice' that their alleged conduct violated [plaintiff's]' constitutional rights.").

Here, and as an initial matter with respect to the first prong, for the reasons stated above, Plaintiffs have adequately alleged § 1983 claims against Defendants for excessive force and for the deprivation of Plaintiffs' rights to a familial relation with the Decedent, in violation of the 4th and 14th Amendments. Thus, the qualified immunity inquiry turns to the second prong of the qualified immunity analysis, which asks whether the right at issue was "clearly established."

With respect to the second prong, Defendants were on notice that their conduct violated the Fourth and Fourteenth Amendments. Here, there can be no question as to whether the right here at issue—the right to not be subjected to excessive force —has been clearly established and is a matter of common sense. Plainly, the Constitution protects a citizen's liberty interest in his or her own bodily security. *See, e.g., Ingraham v. Wright*, 430 U.S. 651, 672–74 (1977). This includes the unjustified use of deadly force, as Defendant Officers engaged in here. Defendant Officers cannot credibly argue that the right to not be subjected to excessive, deadly force is not well established—for they certainly learned this right in the academy.

Moreover, it would be clear to a reasonable officer in Defendant Ellison's position that his conduct was unlawful in the situation he faced. It fails the straight-face test to argue that existing law did not provide Defendant Officers fair warning that shooting a suicidal teenager who they were called to help, who posed no threat to anyone but himself and who was complying with Defendant Officers' commands to lower the gun from his temple, violated Decedent's liberty interest in his own bodily security. *See Tennessee v. Garner*, 471 U.S. 1, 11 (1985); *Graham v. Connor*, 490 U.S. 386, 396 (1989); *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004); *Hardwick v. Vreeken*, 844 F.3d 1112, 1120 (9th Cir. 2017) (quoting *Hope v. Pelzer*, 536

U.S. 730, 745 (2002)); *Glenn v. Washington Cty.*, 673 F.3d 864, 872 (9th Cir. 2011).

Likewise, it is clearly established that parents possess a constitutionally protected interest in the companionship and society of their children. *Kelson v. City of Springfield*, 767 F.2d 651, 654-55 (9th Cir. 1985). Moreover, "[s]everal federal appellate courts," including the 8th Circuit, "have recognized this right in the context of a killing of a child by a state agent." *Id.* (citations omitted); *Mattis v. Schnarr*, 502 F.2d 588, 593–95 (8th Cir.1976)).

Accordingly, Defendants are not entitled to the complete defense of qualified immunity and Defendants' Motion, to the extent founded upon that defense, should be denied.

## II. Plaintiffs' Second And Fourth Causes Of Action Against The City Of Benton And Defendant Officers In Their Official Capacity Are Adequately Pled

Defendants' sole argument in support of its motion for judgment on the pleadings as to Plaintiffs Second and Fourth Causes of Action, brought against the City of Benton and Defendant Officers in their official capacities, is that (1) there is "no underlying constitutional violation," (2) Chief Lane is entitled to "summary judgment" in his individual capacity because there is no underlying constitutional violation; and (3) Chief Lane is entitled to qualified immunity in his individual capacity. Defs.' Mot. p., 13.

However, Defendants argument that there was no underlying constitutional violation fails given that, for the reasons stated above, Plaintiffs have pled sufficient facts to establish its Section 1983 Claims against Defendant Officers in their individual capacity. Moreover, Defendants' assertions as to Chief Lane are misguided. First, Defendants' have not brought a motion for summary judgment, but rather a Motion for Judgment on the Pleadings, the legal standard for which is different. Second, "[w]hen a governmental offi-

cial is sued in his official and individual capacities for acts performed in each capacity, those acts are treated as the transactions of two different legal personages." *Johnson v. Bd. of Cnty. Comm'rs*, 85 F.3d 489, 493 (10th Cir. 1996) (quoting *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 543 n.6 (1986) (internal quotation marks omitted)).

Additionally, and though not addressed by Defendants,' Plaintiffs have pled facts sufficient to establish its *Monell* claims against Defendants. Thus, Accordingly, Defendants' Motion for Judgment on the Pleadings should be denied as to Plaintiffs' claims against Defendants in their official capacity.

**III. Fifth Amendment Claim**

Plaintiffs have brought four separate causes of action for violation of Plaintiffs' civil rights under 42 U.S.C. §1983. It is important to note that 42 U.S.C. §1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393-94 (1989) (internal quotation marks omitted). For that reason, the Complaint specifically states that "[t]his action arises under the Fourth, Fifth, and Fourteenth Amendments of the Constitution of the United States *and* 42 U.S.C. § 1983." Compl. ¶ 7.

Plaintiffs agree with Defendants' analysis that the Fifth Amendment Due Process Clause is not applicable here, and moves to dismiss its 5th Amendment claim. However, given that the Due Process Clause of the 14th Amendment *does* apply to state actors, there is no basis to dismiss any of Plaintiffs' §1983 causes of action.

**IV. State Tort Claims**

Defendants quite tellingly cite no case law in support of their request that this Court decline to exercise supplemental jurisdiction over the Plaintiffs' state tort claims against Defendants which arise from the same incident

giving rise to Plaintiffs' Federal claims. *See* 28 U.S.C. § 1367(a) (supplemental jurisdiction is proper where the relationship between the federal and state claims is such that they "form part of the same case or controversy under Article III of the United States Constitution.)."

**V. Should the Court Be Inclined to Grant Defendants' Motion, in Whole or in Part, Leave to Amend Should Be Granted.**

In the event that the Court is not satisfied that Plaintiffs have pled their claims sufficiently, the Court should grant Plaintiffs leave to amend. It is well settled that "[t]he court should freely give leave when justice so requires." Fed. R. Civ. P. 15; *Polin v. Dun & Bradstreet, Inc.*, 511 F.2d 875, 877 (10th Cir. 1975). Similarly, if the Court is inclined to decline supplemental jurisdiction and dismiss Plaintiffs' state law claims, such a dismissal should also be without prejudice. *Rippstein v. City of Provo*, 929 F.2d 576, 578 (10th Cir. 1991); *Hansen*, 795 P.2d at 840; *see also Swasey v. W. Valley City*, No. 2:13-CV-00768-DN, 2015 WL 500870, at *2 (D. Utah Feb. 5, 2015) (unpublished) (dismissing claims against many of the present Defendants without prejudice).

While Plaintiffs are not requesting leave to amend at this time, Plaintiffs expect to discover additional facts once they have had the opportunity to conduct discovery in this matter—which will include taking the depositions of Defendant Officers. See *Johnson v. Revenue Mgmt. Corp.*, 169 F.3d 1057, 1060 (7th Cir. 1999) (noting that "[a] judge should not rebuff a litigant's effort to supplement the complaint or provide legal argument in support of the suit," reasoning that "[b]ecause complaints need not articulate legal theories . . . and because the skeletal presentation in a notice pleading may be fleshed out later, a decision without giving plaintiff the opportunity to argue or augment his position is premature.") (internal citations omitted)). Considering the seriousness of the allegations and the extreme nature of

dismissal, justice would best be served by granting leave to amend under these circumstances.

## CONCLUSION

In accordance with the foregoing, Plaintiffs request that the Court deny Defendants' Motion for Judgment on the Pleadings.

Respectfully submitted,

/s/ David Gammill_________
David Gammill- CA Bar No. 258286 (*Pro Hac Vice)*
Attorney at Law
644 S. Figueroa St.
Los Angeles, California 90017
Telephone: (213) 625-3900
Facsimile: (213) 232-3255
geragos@geragos.com

**CERTIFICATE OF SERVICE**

I, David Gammill, do hereby state that a true copy of the foregoing motion has been served upon the following by electronic mailing, on this 28th day of September, 2017:

Jenna Adams
Attorney for Defendants
P.O. Box 38
North Little Rock, AR 72115
TELEPHONE: 501-978-6115
FACSIMILE: 501-978-6558
EMAIL: jenadams@arml.org

Michael Mosley
Attorney for Defendants
P.O. Box 38
North Little Rock, AR 72115
TELEPHONE: (501) 978-6131
FACSIMILE: (501) 978-6561
EMAIL: mmosley@arml.org

/s/ David Gammill___________
DAVID GAMMILL